UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

|  |  |  |
|---|---|---|
| KELLY JAMES CLARK, JR. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 3:20-cv-00017 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| GLENN TOMMY PAYNE, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

At approximately 3:00 a.m. on December 26, 2016, Plaintiff Kelly James Clark, Jr. lost control of his vehicle and crashed in a yard in Louisa County, Virginia. Defendant Deputy Glenn Tommy Payne was dispatched to the scene. When Payne arrived at the home, Clark ran into the woods, yelling for help. Payne returned to his vehicle and drove down the road, stopping when he saw Clark standing in the road. Clark made multiple incoherent statements—"y'all got the gun"; "y'all got me, man"; "you got me fucked up"; and "I'm right here, man." Payne exited his vehicle and told Clark to turn around and put his hands in the air. As Payne approached him, Clark looked down at Payne's right hip—where his service weapon was housed in its holster. Clark suddenly lunged for Payne's weapon, and the two engaged in a physical altercation. Payne was eventually able to push Clark between 10 and 20 feet away from him. Payne later testified that after he pushed Clark away, Clark got up and started running back towards him. While doing so, Clark shouted, "I'm going to kill you, motherfucker!" He then twice repeated, "I'm going to kill you!" Payne then drew his service weapon and shot Clark in the chest. The entire incident—from when Clark first lunged at

1

Payne to when Payne shot Clark—lasted approximately 10–12 seconds. Clark survived, and was ultimately convicted of three felonies arising from this event.

Clark was then admitted into the University of Virginia Medical Center ("UVA"). During his time there, he was taken into custody by the Central Virginia Regional Jail ("CVRJ") and guarded by pairs of correctional officers working in 12-hour shifts. While Clark's Amended Complaint alleges that Defendants Correctional Officers Kevin Carl and Colby Lee Miller tackled him on December 28, 2016, causing his lung to collapse, Carl and Miller never guarded Clark on December 28. Rather, Carl and Miller guarded Clark two days later, on December 30, 2016. Faced with this reality, Clark seeks amendment of his complaint at summary judgment to encompass a separate incident that purportedly occurred on December 30. Namely, Clark alleges that while at the hospital, Carl and Miller walked him to a different room where Carl deliberately stepped on his tubing and dislodged it. Clark alleges that he lost a significant amount of blood from this incident, requiring surgery and a blood transfusion. Clark's UVA medical records from that day do not reference or discuss anything like this happening.

Clark brought claims under 42 U.S.C. § 1983 for excessive force under the Fourth and Fourteenth Amendments against Payne, Carl, and Miller. Payne now moves for summary judgment under the doctrine of qualified immunity. Carl and Miller move for summary judgment on the basis, among others, that there is no evidence to support Clark's theory of liability. The parties have completed briefing and the court heard oral argument on February 25, 2021. The matter is now ripe for decision. The court will grant Defendants' motion for summary judgment and deny Clark's motion to amend his complaint.

# I.   BACKGROUND

The relevant facts and procedural posture differ depending on the defendant. The court will (1) review the facts and evidence as to Deputy Payne, (2) review Clark's medical record from UVA, and (3) outline the relevant allegations against Carl and Miller—all in the light most favorable to the nonmoving party, Clark.

## A.   Deputy Payne

It is first imperative to note that Clark admitted in his deposition, and later reiterated in his pleadings at summary judgment, that he has no personal recollection of the incident with Payne. (*See* Kelly James Clark Dep. 35:5–18, Dec. 2, 2020 [ECF No. 89-6[1]]; *id.* at 44:7–45:6; ECF No. 99 at 4 ("Plaintiff has no recollection of the interaction with Deputy Payne.").) Clark also testified that he has no idea why he left his home that morning. (Clark Dep. at 43:7–16.) When asked if he was "completely out of [his] mind when this happened," Clark responded, "Yeah. I mean that's fair." (*Id.* at 101:24–102:2.)

Nevertheless, the record reveals the following facts.[2] At all relevant times to this lawsuit, Payne was a Deputy in the patrol division of the Sheriff's Department for Louisa County. Payne was wearing his uniform, had his badge displayed, and was armed with a .45

---

[1] Defendants attached excerpts of Clark's deposition to their motion for summary judgment as Exhibit 6. The court later requested, and Defendants sent, the entire transcript of Clark's deposition.

[2] Clark "does not dispute" the facts outlined in paragraphs 1–10 and 15–23 in Defendants' brief in support of their motion for summary judgment. (ECF No. 99 at 3–4.) Regarding paragraphs 11–15 (which describe the altercation between Clark and Payne), Clark notes that he "has no recollection of the interaction with Deputy Payne," but asserts that the body-camera footage "does not depict the interaction between the parties and the facts alleged in [D]efendants' memorandum [in paragraphs] 11–15." (*Id.* at 4.)

caliber service pistol. His service weapon was secured on his right hip in a holster with a two-level safety retention mechanism. The first level, the "bail," is a strap that holds the pistol in the holster. Once the bail is released, the second safety retention mechanism requires a button to be pressed in order to remove the weapon.

At approximately 3:00 a.m. on December 26, 2016, Payne received a service call to respond to a single motor-vehicle accident outside a home. When he arrived, Payne saw a red Cadillac wrecked in the home's front yard, and it appeared that the vehicle had run over two trees. Payne saw Clark standing in the road, saying "Help me." When Payne attempted to communicate with Clark, he first ran towards his car, but then changed directions and ran into the woods near the home. At this point, Payne activated his body camera, which was attached to his head.[3]

Payne reported that Clark yelled, "help me, help me," but that Clark ran into the woods and Payne could no longer see him. Payne then directed the residents of the home to go back inside, saying that Clark might be "high or something, he's not right." Payne also reported that he could hear Clark running east, but he did not know if Clark was in the woods or on the road. As Payne walked around the yard, the footage shows Clark's damaged car and the run-over trees. Payne continued to shine his flashlight into the woods. He eventually got into his car and drove down the road for approximately 30 seconds, following Clark's voice. When he saw Clark standing on the road, Payne pulled his car alongside him and stopped.

While Payne was still in his vehicle, he said, "Hey, c'mon talk to me; come here and talk to me." While not all of Clark's statements are intelligible, Clark can be heard saying, "y'all

---

[3] The body-camera footage is Defendants' Exhibit 11.

got the gun," "y'all got me, man," "you got me fucked up," and "I'm right here, man." Payne exited his vehicle and approached Clark, while telling him to raise his hands and turn around. Clark started to raise his hands and turn around. But when Payne reached out to grab Clark's wrists, Clark started to turn around, and he looked down and to the right, at Payne's hip-level. Clark then suddenly lunged toward Payne. Approximately 12 seconds of chaos ensued. At this point, the footage's audio continues, but the body-camera was knocked off of Payne's head. At Clark's later criminal trial, discussed *infra*, Payne testified regarding what happened:

> So when, as, as the defendant reached down, he grabbed my holster with [his] right and left hands. From that point I was trying to break contact with him to get his hands off my pistol. I . . . initially had tried to get on my radio and say that he was fighting me, however I had felt the bail pop down on my holster and so to prevent him pulling the pistol out, I put my right hands on the grip of the pistol and pushed down to keep it in the holster. We started going around in a circle. In that timeframe the band on the back of my heading holding the camera came off and that went flying and the camera is then just dangling by its cord on my shoulder so that's why the camera is bouncing all over the place.

(Clark Trial Tr. 42:10–22, Apr. 24, 2019 [ECF No. 99-3[4]].) The body camera appears to be rapidly moving throughout the entire altercation, and the footage shows "flashes" of what is happening. For example, Clark's face appears for a split second on the footage, and Payne's arms and the road are occasionally visible. In any event, the visual footage does not depict what happens during the 10–12 seconds of chaos.

Listening to the audio, it is abundantly clear that Clark and Payne were in an altercation. Several seconds into the recorded melee, Clark shouts, "I'm going to kill you, motherfucker!"

---

[4] Clark attached the transcript of his criminal trial to his opposition as Exhibit 3.

Payne responds, "Back the fuck up!" And Clark repeats, "I'm going to kill you!" twice. Payne then shot Clark in the chest. Approximately one to two seconds later, Payne can be heard reporting, "shot fired, there was a shot fired!" Payne then wrestled with the body camera for several seconds. While doing so, Payne yells, "Stay down, stay down!" Payne was able to reattach the body camera to its correct position. The footage then depicts Payne approaching Clark with a flashlight and his weapon pointed at Clark. Clark is lying in the road, on his stomach, between the headlights of Payne's vehicle. Payne yells at Clark to put his hands down by his side, but Clark was unresponsive.

Because Clark does not remember this altercation, the only other evidence in the record regarding this incident is Payne's testimony from Clark's later criminal trial and the affidavit he submitted in this matter. Payne's trial testimony about the incident is comprehensive, and the court will outline the salient points in detail, specifically focusing on the circumstances surrounding Payne's use of force and comparing Payne's affidavit testimony when relevant.

Payne's trial testimony confirmed that he is a large man: he is 6'2" or 6'3" and weighed between 300 and 320 pounds in December 2016. (Clark Trial Tr. 73:18–25.) On the other hand, Clark is 5'8" or 5'9" and weighed approximately 175 pounds. (Clark. Dep. at 31:15–17.) Payne also confirmed that he carried his service weapon on his right hip on December 26. (Clark Trial Tr. at 32:24–33:4; *see also id.* at 46:3–5 (Payne: "As I approached him to take him by the hand, take him by the wrist and detain him, his eyes trailed down to the side of my hip where my pistol is.") After Clark lunged at Payne—which is clearly depicted on the body-camera footage—Payne testified that Clark grabbed his weapon holster with both hands. (*Id.* at 47:1–15; *see also* Aff. of Glenn Tommy Payne ¶ 13, Jan. 16, 2021 [ECF No. 89-1].) Payne

then put his hand on his pistol and pushed down so that Clark could not retrieve the weapon. (Clark Trial Tr. at 47:17–25.) Clark was able to pop open the bail (the first safety mechanism). (*Id.* at 48:1–14.) Payne then "spun around," "ripped [his] hip away from [Clark's] grasp," and "pushed him." (*Id.* at 48:19–20.) Payne reiterated:

> I created separation by, by pushing him away from me. At this point I had pretty much done a 180 and was facing the headlights of my vehicle. He went stumbling backwards and landed on the ground for a brief time at which point I did a quick assessment and I knew that he was wearing a heavy jacket, and the taser, if that were to deploy, if I were to deploy that on him and one of the prongs got stuck in the jacket, it wouldn't have any effect on him. I thought about spraying him, however he was probably **ten or fifteen (15) feet** away from me and he was scrambling to get off the ground to come back towards me.

(*Id.* at 49:5–15 (emphasis added).) Payne then testified that after he pushed Clark away, he could not see Clark very well because of Clark's positioning in the car's headlights. (*Id.* at 49:17–19.) Payne, however, knew that Clark "was coming towards [him] and . . . was saying he was going to kill me." (*Id.* at 49:22–23 (emphasis added).)

On cross-examination, Clark's counsel pressed Payne for more details about how far Payne was able to "throw" or "push" Clark:

> Q    And it was only a couple of seconds where you pulled away or ripped away, pushed down and you were able to physically throw Mr. Clark **ten to twenty (20) feet away** where he landed on his butt, correct?
> A    I pushed him. I wouldn't say I threw him, but I pushed him away.
> Q    You ripped away and pushed him with all of your might. That's what you said.
> A    Yes.
> Q    **Twenty (20) feet** when he fell on his butt, right?
> A    **I didn't measure it.** I'm not sure how far he went, how far he stumbled backwards.
> Q    You testified at a hearing previously and it was determined that it **was almost twenty (20) feet away,** wasn't it?

(*Id.* at 67:1–16 (emphasis added).) After the court sustained the Commonwealth's objection at

that point (*id.* at 67:17–22), Payne's cross-examination continued:

> Q       When you pushed Mr. Clark, he ended up approximately **twenty (20) feet away** from you on his butt on the ground.
> A       Okay.
> Q       Is that right?
> A       Yes, if that's what I attested to prior.

(*Id.* at 67:23–68:3 (emphasis added).) In Clark's affidavit, he states that Clark "landed between ten and twenty feet away, between me and the headlights and spotlight of my patrol car."

(Payne Aff. ¶ 15.) At trial, Clark's counsel then asked what happened right before Payne shot Clark:

> Q       And at some point while you're evaluating your options, firearm, taser, pepper spray, . . . you pull your firearm out of your holster and point it in the direction of where that silhouette is, didn't you.
> A       As Mr. Clark was scrambling to get off the ground coming towards me, yes, I did do that, I did pull my pistol.
> Q       And then he gets up off his feet, you start backpedaling, then he makes the threat and then the shot is fired, right?
> A       Three threats, yes.

(Clark Trial Tr. at 69:16–70:1.) Payne's cross-examination testimony then describes how close Clark was to him when he shot Clark:

> Q       And then at that point you said you had your gun out. Mr. Clark makes a threat and then starts coming at you, correct?
> A       Yes.
> Q       And how close did he get to you before you fired the shot?
> A       He was leaned over flailing his arms towards me and trying to get at me. I had pulled my pistol into about as close as I thought I could get without causing a malfunction with it and I believed that he was **three to five feet away from me at the furthest at the time that I pulled the trigger**.
> Q       Now you said he was flailing his arms at you. Can you describe for the Judge and the jury exactly what he was doing? Can you show us what he was doing?
> A       He was leaned over running and he was just reaching for me, anything he could grab as he was making the threats.

(*Id.* at 75:3–20 (emphasis added).) In his affidavit, Payne describes the same incident as follows:

8

> Plaintiff then shouted three times that he was going to kill me.
> He was picking himself up off the ground as he yelled the first
> time. The second of these threats came at the exact same time as
> I ordered Plaintiff to back up. He was on his feet charging me at
> this moment. I began backpedaling and drew my service weapon.
> He threatened to kill me a third time, **having closed the
> distance** to me. He was reaching out at me, **within five feet of
> me at this time**. I then fired one shot at Plaintiff.

(Payne Aff. ¶ 17 (emphasis added).) Finally, on redirect at trial, Payne testified again that after

Clark lunged at him and Payne pushed him away, Clark got up and started running towards

him. (Clark Trial Tr. at 86:3–9.)

Clark and Payne had no further interactions after December 26, 2016 until Clark's later

criminal trial in April 2019. Clark was ultimately convicted by a jury of three felonies arising

out of the altercation with Payne: (1) attempted second-degree murder, (2) assault and battery

of law enforcement officer, and (3) attempt to disarm a law enforcement officer engaged in

the performance of his public duties. (*See* ECF No. 89-17 at 2.) On June 27, 2019, Clark was

sentenced. (*See id.* at 4.) On June 18, 2020, the Virginia Court of Appeals denied Clark's

criminal appeal. (*Id.* at 6–13, 15.) Clark is currently incarcerated and serving his sentence.

**B.    Clark's Medical Records from UVA**

After the incident with Payne, Clark was admitted into UVA hospital on December 26,

2016, at 5:00 a.m. (ECF No. 89-9 at 5.)[5] Clark underwent surgery for the gunshot wound,

---

[5] When he was admitted into UVA, his lab work indicated that his blood-glucose level was
453 milligrams per deciliter. (ECF No. 89-9 at 6.) Clark was possibly having a diabetic episode
during the morning of December 26 because of this fact. *See Hyperglycemia in diabetes*, Mayo
Clinic,         https://www.mayoclinic.org/diseases-conditions/hyperglycemia/symptoms-
causes/syc-
20373631#:~:text=Hyperglycemia%20doesn't%20cause%20symptoms,over%20several%20
days%20or%20weeks (last visited Mar. 19, 2021) ("Hyperglycemia doesn't cause symptoms
until glucose values are significantly elevated—usually above 180 to 200 milligrams per

without complications. (*Id.* at 3.) The procedure notes indicate that two days later, on **December 28**, 2016, Clark "became hypoxic and a chest radiograph showed [an] entire collapse of the right lung." (*Id.* at 7.) "Therapeutic bronchoscopy was thus performed urgently." (*Id.*) The doctor's findings state that Clark "had a large mucous plug totally occluding the right mainstem bronchus which was suctioned out." (*Id.*) The bronchoscopy procedure was successful. (*Id.*)

Two days later, on **December 30**, 2016, Clark's medical records describe two incidents.[6] First, at 11:58 a.m., a nurse noted:

> [Patient] agitated and attempted escape from the room. [Patient] states he doesn't feel safe and pulled out his IV and chest tube. [Patient] refusing care at this time. [Patient] is verbally aggressive and agitated. Charge nurse was notified of the situation.

(*Id.* at 12.)[7] Approximately 15 minutes later, at 12:13 p.m., the same nurse noted that Clark "pulled out [his] IV in a fit of rage, [and that he] needs IV placed for pain control meds for

---

deciliter."). But the court must focus on the incident from Payne's perspective and analyze it with the knowledge that he had at the time. It is not the court's role to judge Payne's use of force with all of the knowledge available to the court now. *Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."). This fact, however, may help explain Clark's erratic behavior and why he has no recollection of this event.

[6] The discharge summary notes that these two incidents happened on December 29. (*See* ECF No. 89-9 at 3.) But in relation to the detailed and chronologically ordered notes later in the medical records, as well as the time-stamped videos submitted by Defendants, this is clearly a typographical error. At oral argument, Clark's counsel seemingly suggested that this "discrepancy" created a genuine issue of material fact, yet Clark does not dispute that the two events described above occurred on December 30.

[7] Defendants submitted a video of this first incident as Exhibit 11.

bedside chest tube placement." (*Id.*)

Later that afternoon, the second incident occurred. At 3:08 p.m. (noted as 15:08 on the medical records), a nurse made the following "event note":

> I was called to the room because the patient was agitated and [he] disconnected his Chest Tube and pulled out his IV. He attempted to leave but was held back by 2 officers from jail. Handcuffs were applied in addition to the shackles. The patient was agitated but easily re-directed.

(*Id.* at 11.)[8] The final note for December 30, 2016, entered at 5:42 p.m. (noted as 17:42 on the medical records), states:

> Following an aggressive incident towards law enforcement, law enforcement was given an order from the Warden to place locked restraints on the [patient]. Charge nurse contacted the nursing supervisor, Michelle Miller, RN[,] who consulted with risk management. Security provided the locked restraints to be managed by law [enforcement]. Law enforcement placed the bilateral ankle and bilateral wrist locked restraints on the [patient] at 1740 [5:40 p.m.].

(*Id.*) The medical records do not contain any other notations regarding a third incident on December 30, 2016. (*See id.*) Clark was discharged from UVA on January 1, 2017. (*Id.* at 2.)

## C. Officers Carl and Miller

With Clark's medical records in mind, the court will now review the allegations against Carl and Miller. In Clark's amended complaint, he alleged the following:

> On **December 28**, 2016, while Plaintiff was still being hospitalized in the intensive care unit of [UVA] in the care and custody of the [CVRJ] and guarded by Officers Colby Miller and Kevin Carl, and while Plaintiff was heavily sedated having just undergone multiple surgeries and blood transfusions, Officers Colby Miller and Kevin Carl tackled the Plaintiff, alleging that he

---

[8] Defendants submitted a video of this second incident as Exhibit 13.

> was attempting to leave the room while Plaintiff was handcuffed
> to the bed, with enough force to cause his lung to collapse, again,
> and require additional immediate surgery.

(Am. Compl. ¶ 15 [ECF No. 39] (emphasis added).)

As noted above, Clark's medical records indicate that on December 28, Clark's right lung collapsed, and his doctors successfully performed a bronchoscopy. Contrary to the above allegations in Clark's Amended Complaint, the parties now agree that this procedure had nothing to do with Carl and Miller because they did not guard Clark until two days later, on December 30, 2016. (*See* ECF No. 89-10 at 10.) Moreover, the parties do not dispute that the two December 30 incidents outlined above in Clark's medical records occurred, and Defendants submitted videos of those two incidents. In his opposition, however, Clark "maintains that the incident with Defendants Carl and Miller that is the subject of the current suit and the consequent injuries Plaintiff sustained are not depicted in [those two] videos." (ECF No. 99 at 4.) In other words, Clark now alleges that a third incident, which also allegedly occurred on December 30, is the basis for his claim against Carl and Miller. It appears these new allegations came to light for the first time during Clark's deposition on December 2, 2019.

Specifically, Clark contends that during the morning of December 30, Miller told Clark that they were taking him for a walk in the hospital, and Carl and Miller walked Clark to a second room. (ECF No. 99-1 at 2–3.) Carl and Miller allegedly began to speak to each other about Clark's complaints to the nurses the night before. (*Id.* at 3.) Clark alleges that he thought their tone and verbiage was threatening, and he stood up. (*Id.*) Allegedly, Carl then purposefully stepped on one of Clark's tubes, which dislodged the tube from his body and sprayed blood throughout the room. (*Id.*) Nurses and doctors allegedly performed a blood

transfusion and surgery on Clark, leaving him with a scar on his back. (*Id.*)

Clark described the incident in his deposition several times. (*See, e.g.*, Clark Dep. 49:1–51:14; *id.* at 53:13–54:7.) The following is one description of the event:

> They just talking back and forth. So I got up. Got up. And I was like, help, help, help, help. And that's when they tackled me. And just everything came out. And blood went everywhere. And they had to do a [transfusion, blood transfusion] on me. And that's when they cut, they gave me the 15-inch scar on my back. And like I said, there's something—They [are] covering up a lot of stuff.

(*Id.* at 56:16–23.) Clark expressed confusion as to why this incident was not on video:

> Doctors, they had to come in that room immediately and go to work on me. I got a scar on my back over 15 inches long. I got all spots showing when the tubes came out on my side. Got the scar on my back. They had to go into surgery, because I lost so much blood. They had to go—They had to do a transfusion right then and there from what those two officers did to me.
>
> And I don't know why that's not on video, but I do kind of understand why it wasn't on video because, it would, it would show them up. But they got everything else on video, why they don't have that on video? And on what my lawyer showed me today, you can see the video that your clients have given you, it's from after when it happened. 'Cause you can see the scar on my back on the video that was shown to me.

(*Id.* at 50:8–22.)

In his opposition, Clark "concedes that the evidence revealed through discovery shows that there is a genuine mistake of fact regarding Plaintiff's claims against Defendants Miller and Karl [*sic*] in that the damages Plaintiff alleges against Miller and Karl [*sic*] were sustained on December 30, 2016 and not December 28, 2016[,] as stated in the Complaint." (ECF No. 99 at 3.) Clark seeks to amend his complaint again "to address the mistaken date and move forward with his claim on the merits." (*Id.*)

## II.   RELEVANT LEGAL STANDARDS

### A.   Summary Judgment

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting

14

*Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## B.    Amendment of the Complaint

Under Federal Rule of Civil Procedure 15(a)(2), after the time has passed to amend a pleading as a matter of course, "a party may amend its pleadings only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The Rule further requires that "[t]he court should freely give leave when justice so requires." *Id.* Despite this liberal amendment policy, "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986)).

### III.   ANALYSIS

**A.   Deputy Payne**

Clark's sole argument is that Payne's use of force was excessive because Clark was not an imminent danger when Payne shot him. Payne's motion for summary judgment requires the court to consider whether qualified immunity protects him from Clark's claim for excessive force under the Fourth and Fourteen Amendments. The court concludes that Clark has failed to establish a genuine issue of material fact as to whether Payne's use of force was reasonable under the circumstances (it clearly was), and, accordingly, that Payne is protected as a matter of law under the doctrine of qualified immunity.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (cleaned up); *see Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Lucas v. Shively*, 31 F. Supp. 3d 800, 810 (W.D. Va. 2014). Overcoming qualified immunity requires a plaintiff to make two showings: (1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) the violation is of a clearly established right of which a reasonable person would have known. *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017); *Duram v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). The court may approach this two-pronged analysis in any order and need not address both prongs. *Pearson v. Callahan*, 555 U.S. 23, 236–37 (2009).

The constitutional provision at issue is the Fourth Amendment's prohibition on unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 394–96 (1989). The relevant inquiry

is whether a given use of force was objectively reasonable, something that depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "Because the 'intrusiveness of a seizure by means of deadly force is unmatched,' a police officer may use deadly force only if the officer has 'probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (quoting *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005)).

Before the court analyzes the *Graham* factors, it is best to address the looming peculiarity in this matter, namely, that Clark does not remember anything about the incident with Payne. Of course, the standard for summary judgment requires the court to draw all reasonable inferences in the light of the nonmoving party. But the only evidence before the court regarding this incident is (1) the body-camera footage; (2) Payne's trial testimony; and (3) Payne's affidavit, outlined in detail above. Fourth Circuit caselaw is also replete with the admonition that summary judgment cannot be defeated by self-serving testimony, or allegations that are unsupported by any evidence. *See, e.g.*, *Williams v. Giant Food, Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) ("[The plaintiff's] testimony that she believed her evaluations to be 'unfair and untrue and incorrect' is merely a self-serving opinion that cannot, absent objective corroboration, defeat summary judgment."); *CoreTel Va., LLC v. Verizon Va., LLC*, 752 F.3d 364, 370 (4th Cir. 2014) ("[I]t is ultimately the nonmovant's burden to persuade us that there is indeed a dispute of material fact. . . . It must provide more than a scintilla of evidence—and not merely conclusory allegations or speculation—upon which a jury could properly find in

its favor." (citation omitted)); *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003) ("A mere scintilla of proof, however, will not suffice to prevent summary judgment; the question is 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party' resisting summary judgment." (citation omitted)). Under this well-established standard, and without any other evidence in the record, summary judgment is the ineluctable result. With this in mind, the court will proceed and analyze the *Graham* factors.

The first factor, the severity of the crime(s) at issue, weighs in favor of Payne. Immediately preceding Payne's use of force, Clark lunged at Payne and attempted to take Payne's service weapon. (*See* Clark Trial Tr. at 81:23 (Payne: "He tried to take my pistol out of my holster.").) Clark also verbally threatened to kill Payne three times. Indeed, Clark was convicted of attempted second-degree murder, assault and battery of a law enforcement officer, and attempt to disarm a law enforcement officer engaged in the performance of his public duties. These crimes are undoubtedly severe.

The second factor—whether the suspect posed an immediate threat to the safety of the officer or others—also weighs in favor of Payne. The body-camera footage shows that when Payne instructed Clark to raise his hands, Clark lunged towards Payne. Even though the video does not show the altercation past this point, the audio unquestionably demonstrates that a physical altercation occurred between Clark and Payne. Payne testified that Clark tried to grab his gun, but he was able to push Clark between 10 and 20 feet away. Assuming that Payne pushed Clark 20 feet away—as the court must make that inference in favor of Clark— Payne also testified that Clark got up and started running back towards him. While he was

doing so, he yelled, "I'm going to kill you, motherfucker," and "I'm going to kill you," twice. Ultimately, Payne testified that he shot Clark when he was only three-to-five feet away from him. Under those circumstances, a reasonable person would infer that Clark was attempting to kill Payne, and that Clark posed an immediate and deadly threat to the officer's safety.

Clark's sole argument falls squarely under this factor. He argues that after Payne "was able to throw [Clark] ten[9] feet away and backpedaled away from [him], any imminent danger had passed, if it had ever existed at all." (ECF No. 99 at 2.) There are several flaws in Clark's argument. First, and most importantly, the argument ignores Payne's testimony that Clark started running back towards him while shouting death threats. Payne testified that Clark was only three-to-five feet away when Payne shot him. The court cannot simply ignore evidence in the record and assume that another version of the events occurred when Clark did not produce *any* evidence to the contrary. Second, the contention that no danger "existed at all" is contradicted by the evidence, or any reasonable understanding of that evidence. The court recognizes that the *visual* evidence is chaotic during the 10–12 seconds in which the altercation occurred. But it cannot be disputed that Clark lunged toward Payne, as that is clearly depicted in the footage. Moreover, the *audio* from the footage cannot be ignored. One can hear Clark verbally threatening to kill Payne. Payne also yelled, "Back the fuck up!" approximately two-to-three seconds before Payne shot Clark. This suggests that Clark was—consistent with Payne's testimony—running back towards Payne when the shot was fired. Finally, it is

---

[9] Clark's opposition vacillates between whether Payne "threw" or "pushed" Clark 10 or "almost" 20 feet away. (*Compare* ECF No. 99 at 10 ("The altercation then ensued, Deputy Payne threw Plaintiff almost twenty feet away, and then as Plaintiff was getting off the ground, Deputy Payne shot him."), *with id.* at 9 ("At the time of the shooting, Plaintiff was unarmed[,] and Deputy Payne had already thrown him between ten and twenty feet away.").

paramount—and worth repeating—that Clark has no recollection of these events. As the Fourth Circuit has instructed, summary judgment cannot be avoided because of "merely conclusory allegations or speculation." *CoreTel Va., LLC*, 752 F.3d at 370. Clark speculates that he was shot while he was still on the ground approximately 20 feet away from Payne. But Clark can offer no proof, and Payne's trial testimony that Clark was running back towards him, the irrefutable audio evidence of Clark's repeated death threats, and the fact that Clark was only three-to-five feet away when Payne filed his single shot, vitiates this theory. Ultimately, because the evidence undermines Clark's interpretation, the court finds that there is no genuine dispute of material fact on this issue. Payne was in immediate danger.

Finally, the third factor, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, also strongly weighs in Payne's favor. The significant facts here unsurprisingly mirror those analyzed above under the first and second *Graham* factors. Clark did not run away. To the contrary, he tried to obtain Payne's weapon and threatened to kill him. Indeed, this incident is a paradigmatic example of violently resisting arrest.

A review of the relevant Fourth Circuit opinions also confirms that Payne did not use excessive force against Clark. In *Harris v. Pittman*, a police officer pursued the plaintiff as a potential criminal suspect and tackled him. 927 F.3d at 269. The two men struggled for the officer's gun. *Id.* The plaintiff then wrestled the gun away from the officer, pointed it at the officer's face, and pulled the trigger; however, the gun malfunctioned and did not fire. *Id.* The police officer regained control of the weapon and shot the plaintiff in the chest. *Id.* The plaintiff did "not argue that [the officer] lacked justification for this initial use of deadly force." *Id.* Then, after the first shot, the officer shot the plaintiff two more times. *Id.* Those *latter* two

shots formed the basis of the plaintiff's excessive force claim, and the parties' stories significantly diverged regarding the relevant circumstances. *Id.* at 269–70. The district court granted summary judgment in favor of the officer. *Id.* at 271. The Fourth Circuit ultimately reversed the district court, finding that it did not construe the facts in the light most favorable to the plaintiff and that the officer was not entitled to qualified immunity. *Id.* at 278–82.

*Harris* is distinguishable from this case and illustrates several salient points. There are several similarities between the facts in *Harris* and those in this case. In both cases, a police officer and the plaintiff engaged in a hand-to-hand struggle involving a firearm. In *Harris*, the plaintiff was able to obtain the officer's gun and unsuccessfully fired it at the officer. In this case, Clark tried, but was unable to obtain Payne's gun. In both cases, the officers ultimately shot the plaintiffs in the chest. In *Harris*, however, the parties did not dispute that the officer's *first* shot was reasonable; rather, the dispute was whether the officer's second and third shots constituted excessive force. Here, Clark argues that Payne's only shot was excessive after Clark (1) lunged for Payne's gun, (2) engaged in a hand-to-hand struggle with Payne, and (3) yelled "I'm going to kill you, motherfucker" and "I'm going to kill you." The court does not read *Harris* for the proposition that a "first shot" is always reasonable; that analysis will always depend on the individual facts and circumstances of the case. But the similarities and differences in these cases illustrate that Payne's first shot was objectively reasonable, and that this case is distinguishable because Payne never fired subsequent shots after Clark was subdued. Moreover, it is important to stress yet again that Clark cannot remember anything about this incident. Unlike in *Harris*, where the plaintiff's testimony described a strikingly different version of events from the officer's testimony regarding the circumstances

21

surrounding the second and third shots, Clark has not offered testimony or evidence describing (or supporting) a different version of the events.

Upon review of the three *Graham* factors, Fourth Circuit precedent, and the undisputed body-camera footage, the court concludes that Payne's use of force was objectively reasonable and that he did not violate Clark's constitutional right under the Fourth and Fourteenth Amendments.[10] For these reasons, Payne is entitled to qualified immunity and the court will enter summary judgment in his favor.

## B.    Officers Carl and Miller

Clark's claims against Carl and Miller fail for similar reasons. Clark concedes that the allegations in his Amendment Complaint are inaccurate. First, the parties agree, and the evidence establishes, that Carl and Miller were not working on December 28, 2016; rather, they only guarded Clark on December 30, 2016. Second, Clark abandoned his allegations about Carl and Miller "tackling" him and causing his lung to collapse while he was handcuffed to his bed, thereby requiring him to undergo surgery for the collapsed lung. (*See* Am. Compl. ¶ 15.) Now, Clark claims that on December 30, Carl and Miller led him to a separate room where Carl deliberately stepped on one of his tubes and dislodged the tube from his body. This incident allegedly required Clark to undergo a blood transfusion and surgery.

In the record before the court, the only documents containing descriptions of this third purported incident on the morning of December 30[11] are Clark's deposition and his own

---

[10] Because Payne did not violate the Fourth Amendment, the court need not consider the second prong of the qualified-immunity analysis or Payne's alternative argument under the doctrine of *Heck v. Humphrey*.

[11]  In Clark's deposition, he maintains that this event happened on December 28. (*See* Clark

unsigned and unsworn interrogatory responses.[12] But Clark has not provided a single piece of other objective evidence corroborating this story. Moreover, other evidence in the record demonstrates that this event never occurred. Clark's otherwise-detailed medical records make no mention of this event. Yet, the medical records document every other surgery, procedure, and incident during his stay at UVA, including the two incidents with Carl and Miller on December 30. Indeed, the medical records contain a chronological list of "flowsheet note[s]" and "event note[s]." (*See* ECF No. 89-9 at 11–12.) As described above, the earliest chronological notation on December 30 is at 11:58 a.m., which describes the event where Clark was agitated, and *he* pulled out his IV and chest tube. (*Id.* at 12 ("[Patient was] agitated and attempted to escape from the room. [Patient] states he doesn't feel safe and pulled out his IV and chest tube.").)

For these reasons, Clark has not met his burden by creating genuine issue of material fact because he has not provided even a scintilla of evidence corroborating this set of facts. *See Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 251 (4th Cir. 2018) ("Because Plaintiffs fail to proffer more than a scintilla of evidence to support these allegations, we reject their challenge."). Finally, even if the court allowed Clark to amend his complaint to encompass the

---

Dep. 51:3–7.)

[12] Unsigned and unsworn interrogatory responses are not admissible for purposes of summary judgment. *See Roberts v. Gen. Elec. Co.*, 1 F.3d 1234 (Table), 1993 WL 303308, at *1 n.3 (4th Cir. 1993). When asked at oral argument, Clark's counsel explained that despite the court entering an order requiring Augusta Correctional Facility to deliver the interrogatories to Clark for his signature and return them to his counsel within seven days (ECF No. 79), the court's order went unheeded. In other words, despite counsel's and the court's best efforts to get the interrogatories signed, Clark was never able to sign his interrogatory responses. For purposes of this motion, however, the court's ruling remains the same whether the interrogatory responses are considered or not.

allegations about the third purported December 30 incident, the amendment would be futile because Clark cannot provide any evidence that the event occurred. For these reasons, Clark's motion to amend will also be denied. *See Laber*, 438 F.3d at 426.

## IV.   CONCLUSION

In sum, Clark's opposition to Defendants' motion for summary judgment amounts to speculation without any evidence. The result is that no reasonable jury could find in favor of Clark. For the above reasons, Defendants' motion for summary judgment (ECF No. 88) will be granted and Plaintiff's motion to amend will be denied. Judgment will be entered in favor of Defendants. A separate order will issue.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 24th day of March, 2021.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE